**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| DIONNE MARSHALL and LUCIA GOMEZ, on behalf of themselves and all others similarly situated | : : : : : | |
| Plaintiffs, | : : | Case No.: 13-CV-01471 (RJD)(JO) |
| v. | : : | |
| DEUTSCHE POST DHL and DHL EXPRESS (USA) INC., | : : : | |
| Defendants. | : : : | |

### DEFENDANT DHL EXPRESS (USA), INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

**DUANE MORRIS LLP**

1540 Broadway
New York, New York 10036
Telephone: 212.692.1086
Facsimile: 212.208.2575

*Attorneys for Defendant DHL Express (USA), Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………… iii

I.    INTRODUCTION………………………………………………………… 1

II.   PROCEDURAL HISTORY………………………………………………2

III.  STATEMENT OF RELEVANT FACTS………………………………… 3

      A.    The Parties………………………………………………………3

      B.    Labor Unions……………………………………………………4

      C.    Timekeeping System……………………………………………6

      D.    Specific Policies and Practices At Issue………………………………6

            1.    Grace Periods Varied By Employee and Facility………………………..7

            2.    Meal Break Rules Vary By Employee and Facility……………............... 10

            3.    Marshall's and Gomez's Off the Clock Allegations…………………… 13

IV.   STANDARD OF REVIEW………………………………………............ 13

V.    PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
      SHOULD BE DENIED………………………………………………… 14

      A.    Plaintiffs Fail To Make a Factual Showing that Employees
            Who Worked at LAX and MIA Are Similarly Situated to Them…….............. 14

      B.    The Evidence Does Not Show a Single Decision, Policy or
            Practice at Issue………………………………………………… 16

            1.    Plaintiffs' Cited Legal Authority on "Rounding"
                  Is Inapplicable………………………………………………... 16

            2.    Plaintiffs Have Not Identified an Allegedly Unlawful
                  Policy or Practice That Applies to All Agents at JFK,
                  LAX and MIA………………………………………………... 16

C.     Each of DHL's Different Policies Requires an Individualized, Employee-By-Employee Analysis To Determine If Any Violation Occurred…………………………………………………………… 18

D.     Plaintiffs Lack Evidence of a Uniform Policy or Practice of Unpaid Off-the-Clock Work…………………………………………………… 22

VI.    IF THE COURT GRANTS PLAINTIFFS' MOTION, PLAINTIFFS' PROPOSED NOTICE MUST BE AMENDED……………………………...............23

A.     If Conditional Certification Is Appropriate For Any of Plaintiffs' Claims, Then Notice Should Issue Only as to the JFK Facility, Where Plaintiffs Worked…………………………………………………………23

B.     Notice Should Be Limited By Time Period………………………………….. 24

VII.   CONCLUSION………………………………………………………………25

## TABLE OF AUTHORITIES

**Cases**

*Anglada v. Linens 'n Things, Inc.*,
  No. 06 Civ. 1290(CM)(LMS),
  2007 U.S. Dist. LEXIS 39105 (S.D.N.Y Apr. 26, 2007)........................................................24

*Armstrong v. Weichert Realtors*,
  No. 05 Civ. 3120(JAG),
  2006 U.S. Dist. LEXIS 31351 (D.N.J. May 19, 2006) ..........................................................23

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*,
  No. 3:10-cv-592,
  2011 U.S. Dist. LEXIS 105302 (W.D.N.C. Sept. 16, 2011) ..................................................20

*Brickey v. Dolgencorp., Inc.*,
  272 F.R.D. 344 (W.D.N.Y. 2011).........................................................................................21

*Byard v. Verizon W. Va., Inc.*,
  287 F.R.D. 365 (N.D. W. Va. 2012) .....................................................................................16

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
  595 F. Supp. 2d 200 (N.D.N.Y. 2009)...................................................................................18

*Diaz v. Elecs. Boutique of Am., Inc.*,
  No. 04-CV-0840E(Sr),
  2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005)......................................................20

*Eng-Hatcher v. Sprint Nextel Corp.*,
  No. 07 Civ. 7350(BSJ),
  2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) .......................................................................23

*Enriquez v. Cherry Hill Mkt. Corp.*,
  No. 10-cv-5616(FB)(ALC),
  2012 U.S. Dist. LEXIS 17036 (E.D.N.Y. Feb. 10, 2012).......................................................25

*Fengler v. Crouse Health Found., Inc.*
  595 F. Supp. 2d 189 (N.D.N.Y. 2009)...................................................................................18

*Fernandez v. Wells Fargo Bank, N.A.*,
  No. 12 civ. 7193(PKC), 12 civ. 7194 (PKC),
  2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 28, 2013).....................................................22

*Flores v. Osaka Health Spa, Inc.*,
No. 05 Civ. 962,
2006 U.S. Dist. LEXIS 11378 (S.D.N.Y. Mar. 16, 2006) ................................ 14-15

*Guillen v. Marshalls of MA, Inc.*,
841 F. Supp. 2d 797 (S.D.N.Y. 2012).................................................................18

*Hinterberger v. Catholic Health Sys.*,
No. 08-cv-380S,
2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 20, 2009)....................................22

*Hoffman v. Sbarro, Inc.*,
982 F. Supp. 249, 261 (S.D.N.Y. 1997)..............................................................14

*Hoffmann-La Roche, Inc. v. Sperling*,
493 U.S. 165 (1989).................................................................................14, 16

*Jenkins v. TJX Cos.*,
853 F. Supp. 2d 317 (E.D.N.Y. 2012) ..........................................................14, 18

*Laroque v. Domino's Pizza, LLC*,
557 F. Supp. 2d 346 (E.D.N.Y. 2008) .................................................................24

*Levinson v. Primedia, Inc.*,
No. 02 civ. 2222(CBM),
2003 U.S. Dist. LEXIS 20010 (S.D.N.Y. Nov. 6, 2003) .......................................18

*MacGregor v. Farmers Ins. Exchange*,
No. 2:10-CV-03088,
2011 U.S. Dist. LEXIS 80361 (D.S.C. July 22, 2011) .........................................21

*Mendoza v. Casa de Cambio Delgado, Inc.*,
No. 07-cv-2579(HB),
2008 U.S. Dist. LEXIS 27519 (S.D.N.Y. Apr. 7, 2008).......................................23

*Mike v. Safeco Ins. Co. of Am.*,
274 F. Supp. 2d 216 (D. Conn. 2003) ................................................................16

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010),
*cert. denied*, 132 S. Ct. 368, 181 L. Ed. 2d 234 (2011) .......................................14

*Qing Gu v. T.C. Chikurin, Inc.*,
No. 13 cv 2322(SJ)(MDG),
2014 U.S. Dist. LEXIS 53813 (E.D.N.Y Apr. 17, 2014) .....................................14

*Shockey v. Huhtamaki, Inc.*,
  730 F. Supp. 2d 1298 (D. Kan. 2010) ...................................................................16

*Siewmungal v. Nelson Mgmt. Grp. Ltd.*,
  No. 11 Civ. 5018 (BMC),
  2012 U.S. Dist. LEXIS 28181 (E.D.N.Y. Mar. 3, 2012) .......................................23

*Suarez v. S&A Painting & Renovation Corp.*,
  No. 08-cv-2984(CPS)(JO),
  2008 U.S. Dist. LEXIS 95184 (E.D.N.Y. 2008)....................................................23

*Troester v. Starbucks Corp.*,
  No. 12-cv-7677 GAF (PJWx),
  2014 U.S. Dist. LEXIS 37728 (C.D. Cal. Mar.7, 2014) ........................................21

*Vasquez v. Vitamin Shoppe Indus.*,
  No. 10 Civ. 8820,
  2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11, 2011) ........................... 14-15, 24

*Zheng v. Good Fortune Supermarket Grp.(USA), Inc.*,
  No. 13-cv-60(ILG),
  2013 U.S. Dist. LEXIS 130673 (E.D.N.Y. Sept. 12, 2013)....................................21

## Statutes

29 U.S.C. § 216(b) ........................................................................................... 13-14

## Other Authorities

29 C.F.R. § 785.11 ..................................................................................................20

29 C.F.R. § 785.48(b) .............................................................................................16

## I.   INTRODUCTION

Plaintiffs Dionne Marshall and Lucia Gomez worked at DHL Express (USA) Inc. ("DHL") as Agents[1] exclusively at one location, John F. Kennedy Airport in New York ("JFK"). Only one former Agent has opted-in to this litigation in the 14 months since the case was filed, and she also worked solely at JFK.[2]  Despite their admitted lack of personal knowledge, Plaintiffs attempt to collectively represent approximately two hundred non-exempt Agents of DHL who worked at either JFK, Miami International Airport in Florida ("MIA"), or Los Angeles International Airport in California ("LAX"), claiming—based upon their individual, isolated experiences—that DHL failed to pay all of these employees for all hours worked.

Plaintiffs claim (1) all employees worked before their shift and were subject to rounding that resulted in nonpayment of wages; (2) all employees worked during their meal break and were subject to a meal deduction; and (3) all employees were subject to off-the-clock work without pay.  However, each site had its own particular circumstances: the disputed wage and timekeeping policies and practices varied location by location, manager by manager, and employee by employee.  Plaintiffs' Motion miscites sworn testimony in this regard.  In reality:

- Different grace periods at the start of shifts were in place at JFK, MIA and LAX, such that employees could clock in before their shift (and not work) if they so chose.  But there is no "uniform" pre-shift grace period (which Plaintiffs wrongfully refer to as "rounding") in place.  Each facility decided whether to use grace periods at the beginning of Agents' shifts, and if so, the length of same. **Critically, based upon the Kronos rules in place, some Agents at each site never experienced grace periods**.

- Contrary to Plaintiffs' unsupported assertions, there is no "universal" "automatic meal break deduction" at DHL.  Meal break rules were chosen by and unique to

---

[1]  "Agents" as that term is used in this Opposition includes Clearance Agents, Senior Clearance Agents and Customs Brokerage Agents at JFK, MIA or LAX.

[2]  On May 9, 2014, the two other opt-in plaintiffs, Sharon Dias, and Maria Silva, withdrew their opt-in consent to join forms.  (Docket Nos. 60, 61.)  Their withdrawal was "so ordered" by this Court on May 12, 2014.

each facility, and the rules changed over time at each location.  Most locations
have never had any sort of "automatic meal deduction" in place.  **Over a dozen
different meal break rules applied to the employees at issue during the
statutory period**.

- Each location has its own management team.  Supervisors and managers
responded to grace periods and meal break rules differently.

- Agents at two of the three facilities (JFK and MIA) are unionized and subject to
collective bargaining agreements ("CBA") that govern their terms and conditions
of employment.  Under the CBA in place at JFK, overtime is paid after eight (8)
hours in a day, and holidays, sick leave and vacation time count towards hours
worked in a week; thus, JFK employees frequently are paid overtime for weeks in
which they do not actually work over 40 hours in a week.  MIA's CBA contains
different terms.  The third facility, LAX, is not unionized.

- Individualized inquiries predominate and preclude a finding that Plaintiffs are
similarly situated to the putative class.  The nature of Plaintiffs' claims regarding
alleged work during their pre-shift grace period and/or meal break, and their off-
the-clock claims, require that for each day worked, for each and every class
member, a jury will have to determine what timekeeping rules applied to the
employee; whether work occurred; how frequently and for how long; whether the
Agent reported the work and was compensated for it; and whether the particular
supervisor had knowledge of the alleged uncompensated work.

Plaintiffs do not meet their burden to establish that they are "similarly situated" to those
they seek to represent.  Moreover, the proposed collective action would be grossly
unmanageable, with each employee issue requiring individual analysis under the Fair Labor
Standards Act ("FLSA").  For these reasons, Plaintiffs' motion must be denied.

## II.   PROCEDURAL HISTORY

On March 20, 2013, Plaintiffs filed a purported collective action complaint.[3]  (Docket
No. 1.)  Eleven months later, they filed a First Amended collective action complaint alleging that
DHL violated the FLSA by not compensating all Agents at JFK, MIA and LAX "during meal
breaks," for work performed "before the beginning of their shifts," for "off the clock" work,

---

[3]   Both the initial Complaint and the First Amended Complaint include class action allegations under New York
law.  Plaintiffs' Motion and Defendant's Opposition focus solely on Plaintiffs' collective action allegations under
the Fair Labor Standards Act.

resulting in failure to pay putative members "time and one half of their regular rate of pay for hours worked beyond forty hours in a workweek." (Docket No. 51, ¶ 38.)

      Extensive discovery has occurred.  Plaintiffs and DHL have exchanged documents (including ESI) and interrogatories.  (Fletcher Decl. ¶ 3.)  In November and December 2013, DHL deposed Plaintiffs Marshall and Gomez respectively.  (*Id.*)  To date, Plaintiffs have deposed six DHL employees, including a 30(b)(6) representative.  (*Id.*)  The parties' fact discovery cutoff date in this case, May 20, 2014, means that all discovery opportunities other than expert discovery will close in mere days.  (Docket No. 50.)

## III.    STATEMENT OF RELEVANT FACTS

### A.    <u>The Parties</u>

      Each of the two named Plaintiffs worked as Agents only at the JFK facility.  (Marshall Decl. ¶ 2; Gomez Decl. ¶ 2.)[4]  Both of the Plaintiffs deposed by DHL admitted under oath that they were never employed at and have <u>no knowledge of the policies or practices at MIA or LAX</u>. Ms. Marshall, for example, has no knowledge of whether LAX is union or non-union, and she knows only one person at LAX, whom she has never asked about rounding or meal periods. (Depo. Tr. of Dionne Marshall ["Marshall Dep."] 38:17–19, 39:2–13.)[5]  Despite Ms. Marshall's allegations against DHL in the First Amended Complaint and in Plaintiffs' Motion, she does not know whether LAX has a 10-minute rounding rule on the front end of a clock in.  (*Id.* at 66:11–19.)  Ms. Marshall also does not know whether LAX has a 30-minute automatic deduction for meals.  (*Id.*)

---

[4]  The Declarations of Plaintiff Marshall and Plaintiff Gomez, as cited throughout this Opposition, refer to Exhibits B and C of the Declaration of Brett R. Gallway in support of Plaintiffs' Motion.

[5]  Throughout this Opposition, deposition transcripts are  referred to as "[DEPONENT'S LAST NAME] Dep." The cited excerpts are attached as exhibits to the supporting Declaration of Christina J. Fletcher, Esq.

Similarly, Ms. Gomez admits that she has never spoken to any Agent who works at MIA or LAX about meal periods, rounding of time, or off the clock work. (Gomez Dep. 33:25–34:7, 35:7–24.) She has no idea if LAX or MIA Agents are unionized. (*Id.* at 36:10–16.) She does not know if LAX or MIA uses a 10-minute rounding period before the start of a scheduled shift. (*Id.* at 52:7–14.) Further, she does not know if LAX or MIA have a 30-minute automatic meal deduction. (*Id.* at 62:9–14.)

Moreover, the First Amended Complaint alleges that "Agents are regularly required to perform off-the-clock work before they are scheduled to begin work and/or after their shift is scheduled to end." (Docket No. 51 ¶ 27.) Ignoring the vast amount of overtime paid to Ms. Gomez and Ms. Marshall during their employment as Agents at JFK,[6] the primary supporting evidence offered by Plaintiffs of their alleged "off the clock" work is the sparse anecdotal account of Ms. Marshall and Ms. Gomez. (*See* Pl.s' Mot., Gallaway Decl., Ex. B, ¶ 10; Ex. C, ¶ 10.) *Plaintiffs have offered no evidence of off-the-clock work by any Agent at MIA or LAX.*

**B.**   **Labor Unions**

During the relevant time period, Agents who worked at JFK or MIA were union members. (Nuttall Dep. 21:2-8.) The LAX facility was not unionized. (*Id.*) The two Plaintiffs and one opt-in were members of Teamsters Local 295 (formerly Local 851) at DHL's JFK facility. (Nuttall Dep. 49:2-51:20, Ex. 2.) During the relevant time period (March 20, 2010–present), employment terms were governed by a CBA. (*Id.*) The CBA governs all hours, wages and working time for bargaining unit employees, including Plaintiffs. (*Id.*) Each employee has a contracted minimum rate and other wages and fringe benefits as described, bargained for and guaranteed by the CBA. (*Id.*) Article 17 of the 2009–2014 CBA guarantees that overtime shall

---

[6] *See, e.g.*, Coon Decl., ¶ 35-36, Ex. 2 (Marshall was paid for 1,232 hours of overtime from October 2008-November 2012).

be "paid at the rate of time and one-half (1 ½) and employee's regular straight-time hourly rate

of pay **for all hours actually worked in excess of eight (8) hours in any one (1) day**, or in

excess of forty (40) hours per payroll week"; and **holidays, paid sick time, and paid vacation**

**time count as weekly time worked for determining entitlement to overtime pay**.[7]  (*Id.*, Ex. 2

at 69–70.)  The CBA mandates a 30-minute unpaid meal period.  (*Id.* at 117.)  Assignment of

overtime is strictly governed by seniority, and overtime is monitored by the union to ensure it is

allotted in accordance with the CBA.  (Nuttall Dep. 172:1-176:21.)   Despite an active union, no

grievances involving the pre-shift grace period, meal periods or off-the-clock work have ever

been filed by Agents at JFK.[8]  (*Id.* at 102:3-20, 29:5-30:23; *see also* Marshall Dep. 53:21–54:11.)

    The MIA Agents are represented by Local 769 and covered by a CBA that governs all

hours, wages and working time for bargaining unit employees.  (Camera Dep. 86:9–19, Ex. 4.)

The CBA mandates a 30-minute unpaid meal period and two 15-minute paid breaks for full-time

employees.  (*Id.* at 10–12.)  Under the CBA, overtime is "paid for all hours worked in excess of

forty (40) hours in a work week, and for purposes of counting the forty (40) hours, **only actual**

**work time**, **plus paid vacation and paid holidays** (designed and floating) are counted."[9]  (*Id.* at

23.)  Assignment of overtime to Local 769 members is governed by seniority under the terms of

---

[7] Plaintiffs have stipulated that when "calculating damages for alleged unpaid hours worked by the putative class or collective action members, if any, Plaintiffs will credit any eight-hour daily overtime paid under a collective bargaining agreement," and "in calculating hours worked for putative class or collective action members, the calculations shall not include time not worked (but credited for overtime purposes) on holidays, paid sick leave and paid vacation leave." (Docket No. 42, ¶¶ 4–6.)

[8] DHL's investigation into the sole internal complaint raised by the union shop steward regarding her belief that a few Agents were working off the clock in the summer of 2012 found those concerns to be unsubstantiated, and neither the shop steward nor any union member (including Plaintiffs) ever filed a grievance regarding alleged off the clock work, or any other claim made in this lawsuit.  (Nuttall Dep. 130:6-131:3, *see also* 112:21-115:8, 117:19-118:8.)

[9] Both the JFK and MIA CBAs (which control the terms of employment for Agents at JFK and MIA) guarantee overtime <u>only</u> for **"actual work time,"** not, for example, for all time clocked-in and not working during a voluntary pre-shift grace period.  (Nuttall Dep. Ex. 2 at 69; Camera Dep. 86:9–19, Ex. 4 at 23.)

the CBA.  (*Id.*)

### C.      Timekeeping System

To record work hours, DHL gave each Agent a card to swipe on a time clock.  (*See, e.g.*, Gomez Dep. 42:17–19.)  DHL uses an electronic timekeeping system called Kronos at JFK, MIA and LAX.  (Decl. of Toni Coon ["Coon Decl."] ¶ 2.)  The work schedules of some—but not all—Agents are manually pre-entered into Kronos.  (*Id.* ¶ 4.)  If an Agent's schedule is added to Kronos, then the individual has a "scheduled start time" and a "scheduled end time" on their Kronos record for each workday.  (*Id.*)  If an Agent's schedule is not added to Kronos, there is no pre-programmed start or end time on his Kronos record.  (*Id.*)

Supervisors at each site monitor work hours.  (*Id.* ¶ 5.)  They review employees' time reports in Kronos and confer with employees to resolve any discrepancies on a daily, weekly and/or pay period basis (depending on the supervisor).  (*Id.*)  For example, if an employee forgets to clock in or out, the employee can (but does not always) report this to his supervisor, and his time entries in Kronos can be manually created.  (*Id.*)  DHL generates paychecks based on Kronos records (card-swipe times at the scanners, as manually adjusted by supervisors on occasion).  (*Id.* ¶ 6.)  Accordingly, all Agents are paid based on their Kronos entries.  (*Id.*)

### D.      Specific Policies and Practices At Issue

Plaintiffs allege that DHL's timekeeping practices resulted in a failure to pay non-exempt Agents for all hours worked.  (Pl.s' Mot. at 2, 8.)  Three of DHL's practices are at issue:  (1) *early clock-ins* at the start of each workday, for which some Agents—but not all—are subject to a "grace period," such that if an employee chooses to clock in early by less than 10 minutes or less than 30 minutes (varies by facility), he cannot work until the start of his shift and is not paid during the time gap; (2) *meal break rounding* for some Agents, the rules for which vary by

facility based on the time period and the Agent's full- or part-time status; and (3) *off-the-clock work* performed by either Plaintiff Marshall or Gomez at JFK (for there is no evidence offered by Plaintiffs of a policy or practice that extends any further than themselves).

### 1.   *Grace Periods Varied By Employee and Facility*

No corporate-wide grace period policy exists. (Coon Decl. ¶ 7; Bennett Dep. 40:6-41:16, 81:5-82:4, 86:1-87:8.) Individual facility management chose whether to implement a grace period. (*Id.*) During the applicable time, JFK, MIA and LAX used different "grace periods" for timekeeping purposes. (Coon Decl. ¶ 7.) Specifically, depending upon the facility, a grace period of 10 or 30 minutes occurred at the start of each work day, for <u>some</u> Agents. (*Id.*) Under each facility's rules, Agents are not permitted to work during the grace period, but they are permitted to **voluntarily** punch in during the grace period and use the time for their own personal activities, such as getting a cup of coffee. (*Id.*; Camera Dep. 34:12–35:3, 64:16–65:5; Martinez Dep. 67:13–68:4; Nuttall Dep. 71:19-23, 89:18-91:2, 93:13-21, 97:9-98:7.)

### a.   <u>JFK</u>

At the JFK facility, if there is no schedule input into the Kronos timekeeping system for an Agent, then all pre-shift time is recorded minute-to-minute, and no "grace period" applies. (Coon Decl. ¶ 10.) At JFK, if the work schedule is programmed into Kronos, then there is no "rounding" of time up or down in the traditional sense for Agents, as Plaintiffs claim.[10] Rather, a "grace period" at the beginning of the shift allows Agents—as a courtesy—to **voluntarily** punch in up to 10 minutes early. (*Id.* ¶ 11.) At JFK, the grace period was intended to allow them to punch in, make their way to their workstation, and be ready to begin work at their scheduled shift

---

[10] While Plaintiffs persist in their use of the term "rounding" with regard to the pre-shift grace period, DHL's witnesses clarify that that term does not describe the pre-shift grace period practice. In fact, no pre-shift "rounding" occurred. *See* Bennett Dep. 37:20-38:12, 41:22-42:7 (explaining the difference between "rounding" and the use of a voluntary pre-shift grace period); Camera Dep. 64:16 – 65:5 (explaining grace period); Martinez Dep. 67:13–68:10.

time.  (Nuttall Dep. 71:19-23, 89:18-91:2, 93:13-21, 97:9-98:7.)  Agents are instructed not to

begin work until their scheduled start time, unless prior approval is obtained from management.

(*Id.*)  If an Agent's schedule is input into Kronos and he works before his scheduled start time,

and he was either asked to do so, or on his own informs management he did so,[11] then

management can make an adjustment in Kronos so that the Agent will be paid for that time

worked during the grace period.  (Coon Decl. ¶ 11.)  If that Agent punches in more than 10

minutes before his shift start time, then his time is recorded minute-to-minute from the punch.

(*Id.* at ¶ 12.)

   For example, an Agent is scheduled in Kronos to begin work at 10:00 a.m., and she

punches in at 9:56 a.m., her time will be adjusted in Kronos to the 10:00 a.m. start time (she

would be paid from 10:00 a.m. onward).  (*Id.*)  If the same Agent at JFK had punched in at 9:49

a.m., then her time would be recorded minute-to-minute and not adjusted to the 10:00 a.m. start

time, and she would be paid from 9:49 a.m. onward.  (*Id.*)  If that same Agent's schedule is not

input into Kronos, then she would be paid minute-to-minute from the time of her first punch in.

(*Id.* at ¶ 10.)

   For JFK, DHL and the union agreed that Agents will not incur a "tardy" incidence under

the CBA if they punch in one to five minutes after their scheduled start time.  (Gomez Dep.

37:12-19; Marshall 41:7-21.)

      b. <u>LAX</u>

   If there is no schedule put into Kronos for an Agent at LAX, then all pre-shift time is

recorded minute-to-minute.  (Coon Decl. ¶ 13.)  If there is a schedule put into Kronos, then there

---

[11] At JFK, employees were told to not work during the grace period without prior management approval.  (Nuttall Dep. 178:8-179:13.)  If employees choose to disregard this rule and work, and they inform management that they did so, then they will be paid for their time but may face corrective action for working unapproved time.  (*Id.*)

is a grace period at the beginning of the shift that allows the Agent to **voluntarily** punch in up to

10 minutes before his/her shift begins.  (*Id.*)  The Agents are instructed not to begin work until

their shift start time, unless prior approval is obtained from a supervisor/manager. (Martinez

Dep. 56:18–57:4.)  If an Agent's schedule is input to Kronos and he works before his scheduled

start time, and he was either asked by management to do so, or informs management he did so,

then management can make an adjustment in Kronos so that the Agent will be paid for that time

worked during the grace period.  (Coon Decl. ¶ 14.)  If he did not inform management, there

would be no adjustment to his time; alternatively, if management knew but chose not to adjust

the time in Kronos, there would be no adjustment.  Until July 2013, there was a lock on the clock

on the "in" punch, so LAX Agents were unable to punch in more than 10 minutes before their

shift start time without prior approval from management.  (*Id.* ¶ 15.)  During the relevant time

period, no other facility has used a lock to prevent Agents from clocking in.  (*Id.*)

c.    <u>MIA</u>

At MIA, if there is no schedule put into Kronos for an Agent, then all pre-shift time is

recorded minute-to-minute.  (*Id.* ¶ 17.)  If there is a schedule put into Kronos, there is no

"rounding" of time for Agents at MIA, rather, there is a grace period at the beginning of the shift

that allows the Customs Brokerage Agents to **voluntarily** punch in up to 30 minutes before

his/her shift begins (versus the 10 minute grace period at LAX and JFK).  (*Id.* ¶ 18.)  In general,

Agents at MIA arrive to work no more than 5 to 10 minutes before their shift.  (Camera Dep.

65:5–66:1.)  Agents are instructed not to begin work until their shift start time, unless prior

approval is obtained from a supervisor/manager.  (*Id.* 75:16–18, 76:24–77:6.)  If an Agent's

schedule is input into Kronos and he works before his scheduled start time, and he was either

asked by management to do so, or informs management he did so, then management can make

- 9 -

an adjustment in Kronos so that the Agent will be paid for that time worked during the grace period.  (*Id.* 39:11–17.)  If an Agent punches in more than 30 minutes before his/her shift start time, the time is recorded minute-to-minute from the punch.  (Coon Decl. ¶ 18.)

### 2.      *Meal Break Rules Vary by Employee and Facility*

Meal break rules are widely disparate and not generalizable across the three facilities. There are over a dozen rules at issue depending upon the facility and employee. (*Id.* ¶ 8.)

#### a.      JFK

The CBA governing Agents at JFK mandates an unpaid 30 minute meal break.  (Nuttall Dep., Ex. 2. at 117.)  Timekeeping rules for this 30 minute meal break depend on whether the Agent is a full- or part-time employee, and whether DHL manually inputted the Agent's work schedule into Kronos.  (Coon Decl. ¶ 19.)

For full-time and part-time Agents at the JFK facility whose schedule is <u>not</u> manually input into Kronos, time punches are recorded minute-to-minute.  (*Id.* ¶ 20.)  For full-time Agents whose schedules <u>are</u> manually input into Kronos, the following rules apply:  (1)  if there is no punch out for lunch, <u>no</u> time is deducted and time is recorded minute-to-minute; (2) if there is a punch out/in for lunch that totals less than 30 minutes, the punch is rounded to 30 minutes, and DHL expects the Agent to perform no work until the 30-minute unpaid lunch period expires (the CBA mandates a 30 minute unpaid lunch period); and (3) if there is a punch out/in for lunch that totals more than 30 minutes, the punches are recorded minute-to-minute.  (*Id.* ¶ 21; Nuttall Dep., Ex. 2 at 117.)

For part-time JFK Agents whose schedules <u>are</u> manually input into Kronos, those that work the 2:00 am to 7:00 a.m. shift are assigned a specific pay rule in Kronos, under which punches for lunch are recorded minute-to-minute.  (Coon Decl. ¶ 22.)  For all others, the above-

described meal break rules for full-time Agents apply.  (*Id.*)

Importantly, applying the above rules, if an Agent at JFK does not punch out for lunch and works through lunch, he or she is paid fully for that "worked lunch."  (*Id.* ¶ 23.)  If an Agent punches out for her 30 minute unpaid lunch period, but her lunch is cut short by a directive from a manager to return to work—a circumstance that does not appear anywhere on the record, as Plaintiffs' declarations indicate that when they cut their lunch short by a few minutes, it was a personal choice (Marshall Decl. ¶¶ 8, 9; Gomez Decl. ¶¶ 8, 9)—then the manager can make an adjustment in Kronos so that the Agent is paid for the time she worked during her meal period, and the time does not round to the full 30 minutes.  (Coon Decl. ¶ 23.)

As is true for the JFK facility, full- and part-time Agents who worked at MIA or LAX for whom a schedule was <u>not</u> manually input into Kronos have minute-to-minute time punches recorded.  Hence, no rounding of meal break times occurs.  (*Id.* ¶¶ 25, 29.)  Consistent practices between the three sites, however, end there.

  b. <u>MIA</u>

The CBA governing Agents at MIA mandates an unpaid 30 minute meal break and two 15-minute paid breaks.  (Camera Dep. 86:9–19, Ex. 4 at 10–12.)  Many Agents personally chose to combine these breaks into a one-hour lunch, although not required to do so.  (*Id.* 43:6–10; *see id.* Ex. 4 at 11, § 4(A) [allowing as part of CBA for employees to combine breaks].)

At the MIA facility, meal break timekeeping rules depend on whether the Agent whose schedule was manually input into Kronos is a full- or part-time employee, whether the Agent remembered to clock out to take a meal break, the hours worked in a given day, and what period of time is being considered.  Beginning with full-time Agents:  (1) between March 2010 to July 2010, all time was recorded minute-to-minute; (2) from August 2010 to the present, if the Agent

has been on the clock for *at least* 4 hours, regardless of whether the Agent punches out for lunch, DHL automatically deducts 30 minutes; and (3) from August 2010 to the present, if the Agent has been on the clock *less than* 4 hours, regardless of whether the Agent punches out for lunch, time is recorded minute-to-minute. (Coon Decl. ¶ 26.)

By comparison, for part-time Agents whose schedules were manually input into Kronos, if they: (1) work *more than* 6.5 hours and punch out for less than 30 minutes, then meal break punches are rounded to 30 minutes; (2) work *less than* 6.5 hours and punch out/in for meals, then time is recorded minute-to-minute; (3) work *less than* 6.5 hours and do <u>not</u> punch out/in for lunch, then no time is deducted; and (4) work *more than* 6.5 hours and do <u>not</u> punch out/in for lunch, then DHL automatically deducts 30 minutes. (*Id.* ¶ 27.)

If a MIA Agent works during his lunch, and Kronos has deducted time, managers can make an adjustment to cancel the deduction. (*Id.* ¶ 28.)

b.  <u>LAX</u>

At the LAX facility, for Agents whose schedules were manually input into Kronos, <u>five</u> different meal break rules applied. From January 2010 to August 21, 2011: (1) if there was no punch out for lunch, time was recorded minute-to-minute, and no time was deducted; (2) if there was a punch out/in for lunch that totaled *less than* 30 minutes, the punch was rounded to 30 minutes, but DHL expected the Agent to perform no work until the 30-minute unpaid lunch period expired; and (3) if there was a punch out/in for lunch that totaled *more than* 30 minutes, the time was recorded minute-to-minute, and no time was deducted. (Coon Decl. ¶ 31.)

From August 22, 2011, to the present, by comparison, meal break punches are recorded minute-to-minute, with a three-minute grace period on the "in" punch (meaning that if an Agent punches back in from his 30-minute meal period late at 31 to 33 minutes, the punch rounds

backwards to 30 minutes).  (*Id.* ¶ 32.)  In addition, until July 2013, the LAX facility used a lock

on the time clock that prevented Agents from clocking in from their meal breaks until at least 30

minutes had passed.  (*Id.* ¶ 33.)

### 3. *Marshall's and Gomez's Off the Clock Allegations*

Marshall and Gomez allege in their declarations that their personal "workload" and

**unnamed** managers and supervisors required them to work off the clock.  (Marshall Decl. ¶ 10;

Gomez Decl. ¶ 11).  Marshall and Gomez both testified, however, that no manager ever required

them to work pre-shift off the clock.  (Marshall Dep. 56:16–21; Gomez Dep. 62:4–8).  Plaintiffs

provide no estimates of the amount of alleged off-the-clock work.  Plaintiffs do not identify a

single other employee at JFK who they claim was also required to work off the clock.  They

identify no employees at LAX or MIA who were required to work off the clock.

Contrary to the picture they try to paint, Marshall and Gomez each earned significant

amounts of overtime.  From October 2008 to November 2012, Marshall was paid for 1,232 hours

of overtime (she worked 3,174 regular hours during this same time period, meaning that almost

30% of her total hours worked were paid at the overtime rate).  (Coon Decl., ¶ 35-36, Ex. 2.)

During the same time period, Plaintiff Gomez was paid for 490.78 hours of overtime.  (*Id.* ¶ 37-

38, Ex. 3.)  Neither Plaintiff provides any reason why she would be allowed to work these high

amounts of overtime "on the clock" but allegedly be subject to a policy or practice requiring

them to work other hours "off the clock."

## IV.  STANDARD OF REVIEW

Under Section 216(b) of the FLSA, a collective action may be maintained  by named

plaintiffs "for and in behalf of . . . themselves and other employees similarly situated."  29

U.S.C. § 216(b).  District courts "have discretion, *in appropriate cases*, to implement" the

collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (emphasis added).

Certification of a collective action follows a two-step process. In the first phase, called the notice stage, the plaintiffs' burden is to demonstrate that they are "similarly situated" to the collective they hope to represent, meaning that all of them "were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368, 181 L. Ed. 2d 234 (2011) (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997). Even at this first stage, "certification is not automatic." *Vasquez v. Vitamin Shoppe Indus.*, No. 10 Civ. 8820, 2011 U.S. Dist. LEXIS 74376, at *9 (S.D.N.Y. July 11, 2011) (citations omitted). To satisfy the "similarly situated" standard, the Court must find "some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims" of a particular unlawful policy or practice. *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) (internal citations omitted); *Qing Gu v. T.C. Chikurin, Inc.*, No. 13 cv 2322(SJ)(MDG), 2014 U.S. Dist. LEXIS 53813, at *9 (E.D.N.Y Apr. 17, 2014). "Although plaintiffs' burden is not onerous, they must provide actual evidence of a factual nexus between their situation and those that they claim are similarly situated rather than mere conclusory allegations." *Flores v. Osaka Health Spa, Inc.*, No. 05 Civ. 962, 2006 U.S. Dist. LEXIS 11378, at *4 (S.D.N.Y. Mar. 16, 2006).

## V. PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED

### A. Plaintiffs Fail To Make a Factual Showing that Employees Who Worked at LAX and MIA Are Similarly Situated to Them

Plaintiffs worked at only the JFK facility. When deposed, Plaintiffs Marshall and Gomez admitted that they have no knowledge regarding alleged off-the-clock work, rounding or meal breaks at either the MIA or LAX facilities. (*See* Marshall Dep. 38:17–19, 39:2–13, 66:11–19;

Gomez Dep. 33:25–34:7, 35:7–24, 52:7–14.)  In their declarations, Plaintiffs describe only what they experienced and observed at JFK.  (*See* Marshall Decl. ¶¶ 1-12; Gomez Decl. ¶¶ 1-12.) They do not even mention the LAX or MIA facilities, nor do they contend that their managers at JFK had any role in the management or operation of MIA or LAX.  (*Id.*)  Plaintiffs have not submitted a single declaration or affidavit from workers at MIA or LAX, nor are there any opt-ins from MIA or LAX.  *The fact discovery cutoff in this case is one week away*.  The parties have essentially completed discovery regarding Plaintiffs' claims and the policies at each facility.

There is simply no evidence that the policies and practices in place at JFK were similar to the policies or practices experienced by Agents at MIA or LAX.  In fact, as set forth above, the substantial proof is that facilities' policies and practices were inherently dissimilar.  Nothing in the FLSA supports conditional certification where there is no evidence of Plaintiffs being "similarly situated" to Agents at other facilities.  *See, e.g.*, *Vasquez*, 2011 U.S. Dist. LEXIS 74376, at *10-13 (denying conditional certification to stores in a "geographically concentrated cluster" where plaintiffs' evidence regarding their employment was insufficient to establish a nationwide or even New York statewide unlawful practice); *Flores*, 2006 U.S. Dist. LEXIS 11378, at *8 (S.D.N.Y. Mar. 16, 2006) (declining to conditionally certify where plaintiff offered "nothing of evidentiary value to support a finding that a factual nexus exists between the way the defendants allegedly compensated [the plaintiff] and the way they may have compensated other employees during the relevant time period").

In the absence of factual support, the Court cannot find that any Agents from the LAX or MIA facilities are "similarly situated" to Plaintiffs.  Thus, Plaintiffs' request to conditionally certify an action that involves employees from all three worksites should be denied in total.

**B.**     **The Evidence Does Not Show a Single Decision, Policy or Practice at Issue**

Courts allow employees to proceed as a group in collective actions where "there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case." *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003). No collective action can be contemplated if every opt-in plaintiff must testify regarding his or her work activities. The question presented is whether Plaintiffs have established that this is an "appropriate" case for conditional certification based on "common issues of law and fact." *Hoffmann-La Roche*, 493 U.S. at 169-170. They have not.

**1.**     *Plaintiffs' Cited Legal Authority on "Rounding" Is Inapplicable*

No "rounding" of work time occurred. Each facility had a grace period during the time at issue. A grace period is not "rounding" as envisioned by the FLSA, where time entries are rounded up or down to a set increment. *Cf.* 29 C.F.R. § 785.48(b). Rather, employees whose schedules have been programmed into the Kronos system may voluntarily choose to punch in up to 10 to 30 minutes before their scheduled start time—depending on the facility and time period at issue. Plaintiffs' arguments about rounded time entries not "averaging out" under the FLSA do not apply here. (*Cf.* Pl.s' Mot. at 3.)[12]

**2.**     *Plaintiffs Have Not Identified an Allegedly Unlawful Policy or Practice That Applies to All Agents at JFK, LAX and MIA*

Plaintiffs falsely describe grace periods (misleadingly called "rounding") and meal break rules at DHL as "uniform" and "universal." (Pl.s' Mot. at 2, 8.) This is not true. The record shows that each site had its own protocols in terms of grace periods and meal breaks, which

---

[12] In their Motion, Plaintiffs failed to cite a single decision regarding grace periods by any district or appellate court in the Second Circuit. Instead, Plaintiffs cite opinions by district courts in Kansas and West Virginia. One of these two cases dealt only with traditional rounding. *See Byard v. Verizon W. Va., Inc.*, 287 F.R.D. 365, 370 (N.D. W. Va. 2012) (describing policy of rounding to nearest quarter hour). The other cited opinion, *Shockey v. Huhtamaki, Inc.*, 730 F. Supp. 2d 1298, 1302 (D. Kan. 2010), granted conditional certification where, unlike this case, the parties had "not engaged in discovery on the merits of plaintiffs' claims and certainly have not completed discovery."

changed over time and applied to different types of employees at each site.  (*See* Coon Decl.

¶¶ 7–33; Bennett Dep. 40:6–41:16, 38:22–39:10; Martinez Dep. 52:20–53:22 [meal breaks at

LAX].)  The "rules" each facility decided to follow, what each supervisor did to implement those

rules, and how each employee behaved, are all unique.  (*Id.*)  Each facility decided whether it

wanted to implement grace periods, and if so, the length of each grace period.  (Bennett Dep.

40:6-41:16; Coon Decl. ¶ 7.)  Facilities also decided on their own how to manage grace periods.

(Bennett Dep. 40:6-41:16.)  Some managers might have allowed employees to work during the

grace period, and others might not have done so.  And if an employees' schedules were not input

into Kronos, then no grace period applied at all.  (Coon Decl. ¶¶ 10, 13, 17.)  Separately, in LAX

until July 2013, there was a lock on the front end of employees' work shifts.  (*Id.* ¶ 15.)  No other

facility used a lock to prevent clocking in.  (*Id.*)  This practice alone might have influenced how

early LAX Agents opted to arrive at work, when they clocked in, and how they spent any pre-

shift time.  A collective case would not capture these details.

     Similarly, with regard to meal periods, Plaintiffs again misstate the record.  DHL has

never had a "universal" policy of automatically deducting for meal breaks at JFK, MIA and

LAX.  (*See* Pl.s' Mot. at 8.)  To the contrary, during the relevant time period, over a dozen

different pay rules for meals affected Agents.  (Coon Decl. ¶ 8.)  LAX alone had <u>five</u> meal rules

in place during the relevant time.  (*See id.* ¶ 30; Martinez Dep. 52:20–53:22.)  Since August

2011, LAX records meal period time minute to minute, and, in employees' favor only, rounds

back to 30 minutes if an employee punches in late from lunch by 1 to 3 minutes.  (Coon Decl.

¶ 32.)  At JFK, if an employee does not punch out for lunch, no time is deducted.  (*Id.* ¶¶ 21, 23.)

Finally, MIA has its own rules, which vary based upon the time period, hours worked by an

employee in a given day, and whether the Agent punched out for a meal, and include a period

where time was recorded minute to minute.  (*Id.* ¶¶ 24-28.)  Regardless, the employees at MIA almost uniformly take *hour long* meal breaks, which is not the case at the other sites.  (Camera Dep. 43:6–10.) Hence, no common plan or policy—lawful or otherwise—has ever existed.[13]

        As here, where Plaintiffs fail to identify a common policy to which they and those they seek to represent as a collective were subject, their motion for conditional certification must be denied.  *See Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 801-802 (S.D.N.Y. 2012) ("[A] collective action is inappropriate as to all employees of a common employer without a showing that the other employees are similarly situated to the plaintiff with respect to the harm suffered by that plaintiff."); *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) (internal citations omitted) (court must find "some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims" of a particular unlawful policy or practice); *Levinson v. Primedia, Inc.*, No. 02 civ. 2222(CBM), 2003 U.S. Dist. LEXIS 20010, at *5 (S.D.N.Y. Nov. 6, 2003) (allegations of a "'company-wide policy' . . . [without] a factual showing that extends beyond [plaintiffs'] own circumstances" are insufficient to meet plaintiffs' burden).

   **C.     Each Of DHL's Different Policies Requires an Individualized, Employee-By-Employee Analysis To Determine If Any Violation Occurred**

        For any of the different grace period or meal break rules described above to be "unlawful," the Court would have to accept Plaintiffs' premise that every minute employees spend "clocked in" means they were actually "performing compensable work."  *See, e.g.*, *Colozzi*

---

[13] Indeed, while no uniform automatic meal deduction policy or practice exists at DHL, courts in this Circuit have rejected plaintiffs' misplaced arguments that they were similarly situated simply by virtue of such a policy, because the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA. *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009); *see also Fengler v. Crouse Health Found., Inc.* 595 F. Supp. 2d 189, 196 (N.D.N.Y. 2009) (finding "something more is required" than "the existence of the break deduction policy practiced through Kronos" "in order to establish that the putative class numbers were all subject to the same unlawful practice").

*v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009) ("The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful."). DHL's deponents disavowed this. (Bennett Dep. 37:2-14; Nuttall Dep. 88:8-21, 98:8-24; Martinez Dep. 67:13-68:10; Camera Dep. 64:16-65:5.) Clocking in **voluntarily** during the grace period or a few minutes early from a lunch period does not mean the Agent was working during those minutes. (*Id.*) In fact, Agents are instructed not to work during those times, and the union negotiated CBAs at MIA and JFK mandate both 30-minute meal periods and payment of overtime only for time actually worked. (Nuttall Dep. 88:6-17, 89:18-91:2, Ex. 2 at 69-70, 117; Martinez Dep. 56:18-57:4; Camera Dep. 75:16-18, 76:24-77:6, 86:9-19, Ex. 4 at 10-12, 23.) No one from DHL testified that employees should be paid for all "clocked" hours; rather, they testified employees should be paid for all worked hours. (Bennett Dep. 37:2-14; Nuttall Dep. 88:8-21, 98:8-24; Martinez Dep. 67:13-68:10.)

It is impossible to generalize whether Agents worked during any grace period gap. Each employee decided whether to voluntarily show up early and clock in. Some employees showed up late regularly. Some showed up on time. Some showed up early. By way of example, Plaintiff Marshall's time records show that she regularly punched in up to 5 minutes late for her shift. (Coon Decl., Ex. 2.) By definition, she could perform no compensable work during a pre-shift grace period when she arrived late to work, after her shift had already started. The fact finder would need to assess and weigh testimony from *each* employee to determine if he or she performed work during a grace period. Even the testimony cited in Plaintiffs' Motion proves this. (*See* Pl.s' Mot. at 12 [describing how often Plaintiff Gomez decided to work before her scheduled start time at the JFK facility].) Moreover, each supervisor will have her own story on whether she knew of Agents who worked during the grace period, whether she confronted

employees, and whether DHL paid employees for that work or not.  (*See* 29 C.F.R. § 785.11

[regarding actual or constructive knowledge of work performed]; Martinez Dep. 22:14-22

[describing some Agents worked unsupervised]; Camara Dep. 64:7-65:9 [describing how Agents

get coffee or attend to personal matters on "company time" after their shift began].)  Those

individualized inquiries—and not the fact that DHL uses the same timekeeping software at each

facility—undermine Plaintiff's request for conditional certification of their pre-shift grace period

(or as they improperly refer to it "rounding") claim.  *See Blaney v. Charlotte-Mecklenburg Hosp.*

*Auth.*, No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302, at *34 (W.D.N.C. Sept. 16, 2011)

(finding because "there is no common policy or scheme and instead individualized questions of

fact predominate, the action is not an appropriate one for certification."); *Diaz v. Elecs. Boutique*

*of Am., Inc.*, No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382, *17-18 (W.D.N.Y. Oct. 17,

2005) (concluding that an individualized analysis of plaintiff's schedule, times actually worked,

and whether his timesheet was altered prevents a finding that plaintiff is similarly situated to the

putative class).

  The many different meal period rules also varied greatly in practice.  Agents at MIA

combine their unpaid 30-minute meal break with their two 15-minute paid breaks to take a one-

hour lunch.  (Camera Dep. 43:6–10.)  Different rules at play at each facility result in Agents

being treated differently for the same situation: an Agent who did not punch in or out for lunch at

JFK would be compensated for this time, as no time is automatically deducted; whereas,

depending upon the amount of hours an MIA Agent had on the clock, he may have to inform a

manager in order to get a deduction cancelled if he worked through lunch.  (Coon Decl. ¶¶ 21,

23, 26, 28.)  Also, the same Agent at LAX may have been subject to a lock on the clock for

lunch punches up until July 2013, and never able to punch in early from lunch at all.  (*Id.* ¶ 33.)

Different Agents returned early or on time from meals, some Agents skipped meals or forgot to clock in and out, and some returned late.  (*See* Martinez Dep. 95:15-96:24; Camera Dep. 83:10-84:25; Nuttall Dep. 65:18-23, 69:8-19, 70:12-18.)  Here again, an individualized inquiry would be required to determine for each instance where an employee punched for a shorter than 30-minute lunch period, whether that employee was performing work during the few minutes he or she punched in early, and whether any manager had actual or constructive knowledge of the work being performed.  As with the grace period, these individualized inquiries render the Agents not similarly situated to each other.

Because there is no common practice, policy or scheme applied to all Agents—especially where the policies and supervisors vary at each site—an individual inquiry into each Agents' habits will be required, rendering the collective action mechanism ineffective.[14]  *Brickey v. Dolgencorp., Inc*., 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying certification because plaintiffs failed "even after an substantial pre-certification discovery, to make a modest factual showing that they were subject to a common policy or practice that violated the law, as opposed to unlawful actions by individual, anomalous managers"); *Zheng v. Good Fortune Supermarket Grp. (USA) Inc.,* No. 13-cv-60(ILG), 2013 U.S. Dist. LEXIS 130673 (E.D.N.Y. Sept. 12, 2013) (denying conditional certification due to insufficient evidence of a common policy or plan of time-shaving during meal breaks); *MacGregor v. Farmers Ins. Exchange*, No. 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361, at *16 (D.S.C. July 22, 2011) (denying conditional certification

---

[14] DHL has also raised numerous affirmative defenses that will require individualized analysis.  For example, DHL contends that any alleged time Plaintiffs may have actually performed work during the voluntary grace period or upon an early return from lunch is *de minimus* and non-compensable, which will require a day-to-day individual analysis of the amount of time actually worked (versus time clocked in).  *See, e.g.*, *Troester v. Starbucks Corp.*, No. 12-cv-7677 GAF (PJWx), 2014 U.S. Dist. LEXIS 37728, at *14 (C.D. Cal. Mar. 7, 2014) (granting summary judgment for employer where plaintiff spent approximately two to five minutes after he had clocked out every day working to close the store, because the time was "far from substantial and fall well within the 10-minute *de minimis* benchmark.").

where fact finder must "determine whether each individual [plaintiff] actually took lunch breaks, their frequency and duration, whether each [plaintiff's] supervisor advised the employee how to report worked lunch breaks, whether the employee did in fact report worked lunch breaks, and how many, if any of those worked lunch breaks were compensated").

> **D.      Plaintiffs Lack Evidence of a Uniform Policy or Practice of Unpaid Off-the-Clock Work**

"Conclusory allegations of 'system-wide' policies or practices must be at least minimally supported by a plaintiff's affidavit or declaration." *Hinterberger v. Catholic Health Sys.*, No. 08-cv-380S, 2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 20, 2009) at *20 n.13.  Here, the express and implied limitations in Plaintiffs' motion do not provide any such support for Plaintiffs' off the clock allegations.  While the two named Plaintiffs claim that unnamed managers required them to work off the clock and/or had knowledge of them doing so, management practices from no facility other than JFK are mentioned.  (Marshall Decl. ¶¶ 10-11; Gomez Decl. ¶¶ 10-11.)  Indeed, Plaintiffs conceded that they have no knowledge of events at other facilities.  (*See* Marshall Dep. 38:17–19, 39:2–13, 66:11–19; Gomez Dep. 33:25–34:7, 35:7–24, 52:7–14.  *See generally* Marshall Decl.; Gomez Decl.)  Even within JFK, Agents did not share the same managers.  (*See, e.g.*, Marshall Dep. 71:20–73:18; Gomez Dep. 31:9–32:13.)

Plaintiffs simply do not provide <u>any</u> proof of a uniform policy or practice of unpaid off-the-clock work affecting hundreds of Agents at different facilities.  Thus, conditional certification of Plaintiffs' off-the-clock claims is entirely improper.  *Fernandez v. Wells Fargo Bank, N.A.*, No. 12 civ. 7193(PKC), 12 civ. 7194 (PKC), 2013 U.S. Dist. LEXIS 124692, at *30-31 (S.D.N.Y. Aug. 28, 2013) (denying conditional certification where Plaintiffs "have directed the Court to no evidence of a common policy that required such work to be performed off the clock and without overtime pay.  Plaintiffs' evidence on off-the-clock work consists of

individualized and particular incidents."); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 Civ.
7350(BSJ), 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (denying conditional
certification where Plaintiff relied only upon "her own deposition testimony" and "anecdotal
hearsay" to "show that Sprint likely has a common plan or practice, implemented through
individual store managers, requiring [class members] to work uncompensated overtime");
*Armstrong v. Weichert Realtors*, No. 05 Civ. 3120(JAG), 2006 U.S. Dist. LEXIS 31351, at *5
(D.N.J. May 19, 2006) (denying collective treatment where "[a]t best, [plaintiff's] declaration
provides a factual basis for inferring that one loan officer . . . in one office was required to work
unpaid overtime").

## VI.   IF THE COURT GRANTS PLAINTIFFS' MOTION, PLAINTIFFS' PROPOSED NOTICE MUST BE AMENDED

In FLSA actions, it is within the court's discretion to determine the contents of a court-
ordered notice.  *See Siewmungal v. Nelson Mgmt. Grp. Ltd.*, No. 11 Civ. 5018 (BMC), 2012 U.S.
Dist. LEXIS 28181, at *5 (E.D.N.Y. Mar. 3, 2012).  Here, if this Court were to order that any
notice should be sent, DHL respectfully requests that the Court modify Plaintiffs' proposed
notice consistent with the following objections and order the parties to meet and confer regarding
the form and content of the final notice for submission to the Court.  *See, e.g., Mendoza v. Casa
de Cambio Delgado, Inc.*, No. 07-cv-2579(HB), 2008 U.S. Dist. LEXIS 27519, at *10-11
(S.D.N.Y. Apr. 7 2008) (directing parties to meet and confer to agree to a form of notice); *Suarez
v. S&A Painting & Renovation Corp.*, No. 08-cv-2984(CPS)(JO), 2008 U.S. Dist. LEXIS 95184,
at *9 (E.D.N.Y. 2008) (same).

### A.   If Conditional Certification Is Appropriate For Any of Plaintiffs' Claims, Then Notice Should Issue Only as to JFK, Where the Plaintiffs Worked

As required here, courts routinely limit the geographic scope of a plaintiff's request for
notice where the plaintiff has failed to show that employees in other locations were similarly

situated to the plaintiff.  *E.g. Anglada v. Linens 'n Things, Inc.*, No. 06 Civ. 1290(CM)(LMS), 2007 U.S. Dist. LEXIS 39105, at *3, 15–18 (S.D.N.Y. Apr. 26, 2007) (finding "total dearth of factual support" warranting notice of the collective action beyond the stores in which the plaintiff worked); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355 (E.D.N.Y. 2008) (refusing to approve notice to four other locations, as there was no evidence plaintiffs were similarly situated to those workers); *Vasquez*, 2011 U.S. Dist. LEXIS 74376, at *10-13 (limiting class approval to persons at stores in "geographically concentrated cluster" where Plaintiffs worked).

Even if the Court concludes that notice should be issued, the breadth and scope of the proposed notice lacks evidentiary support.  Plaintiffs' declarations and depositions offer <u>no</u> information regarding any DHL location other than Plaintiffs' alleged experiences at JFK.  Plaintiffs admit they have <u>no knowledge</u> regarding the working conditions, hours worked, policies or practices applied, or any other information regarding Agents at MIA or LAX.

The record is conclusive that the policies and practices at JFK about which Plaintiffs complain are not "uniform" or "universal," do not apply at LAX and MIA, and instead differ greatly by facility and by employee.  As such, to the extent the Court were to conditionally certify any collective action (which it should not), certification should be limited to employees who share the Plaintiffs' job titles at JFK, where Plaintiffs worked.  Employees from MIA and LAX should be excluded from notice of the potential collective action.[15]

## B.   Notice Should Be Limited By Time Period

Plaintiffs propose sending the notice to JFK employees employed from March 20, 2007,

---

[15] If the court is inclined to certify all locations of this action (which it should not), based upon the different timekeeping policies and practices and management in place at each facility, subclasses for JFK, MIA and LAX should be ordered by the Court, and separate notice issued to each location.  In addition, should notice issue to MIA and LAX, DHL will request the Court allow discovery related to any individuals who opt-in from these facilities (in addition to any new JFK opt-ins), as there will have been no such opt-ins by the time fact discovery is scheduled to close on May 20, 2014.

to the present, which does not comport with the three-year FLSA statutory period applicable to the claims that they are seeking to have conditionally certified.  *See Enriquez v. Cherry Hill Mkt. Corp.*, No. 10-cv-5616(FB)(ALC), 2012 U.S. Dist. LEXIS 17036, at *3 (E.D.N.Y. Feb. 10, 2012).  In addition, the Court should calculate the time period for provision of notice from three years prior to the date of the relevant order, rather than three years prior to the complaint.  *See id.* at *3.  Accordingly, the correct time period for recipients at all locations, including JFK, is three years prior to the date of the Court's order, not the date the Complaint was filed, as proposed by Plaintiffs.

## VII.   CONCLUSION

Because resolution of Plaintiffs' FLSA claims depends on countless individualized questions of fact, which in light of due process considerations can only be fairly resolved on an individual basis, Plaintiffs' motion for conditional certification should be denied.  If Plaintiffs' Motion is granted, the proposed notice to potential opt-in plaintiffs should be amended as requested above to limit such notice to the JFK facility and three years prior to the Court's order.

Dated: May 13, 2014                         **DUANE MORRIS LLP**
New York, New York

                                            */s/ Christina J. Fletcher*
                                            Michael Tiliakos
                                                mtiliakos@duanemorris.com
                                            Julie A. Vogelzang (*admitted pro hac vice*)
                                                jvogelzang@duanemorris.com
                                            Kevin E. Vance (*admitted pro hac vice*)
                                                kevance@duanemorris.com
                                            Christina J. Fletcher
                                                cjfletcher@duanemorris.com

                                            **DUANE MORRIS LLP**

                                            1540 Broadway
                                            New York, New York  10036
                                            Telephone:  212.471.4720
                                            Facsimile:  212.656.1219

                                            *Attorneys for Defendant DHL Express (USA), Inc.*

- 25 -